45      121'
25 SC ⁶579

## Altemose *versus* Hufsmith.

*Warrant lines.*—*Effect of on question of whether land is seated or unseated.*—"*Occupancy and abandonment*" *of land, question of fact for the jury.*—*Evidence of abandonment.*—*Evidence of defendant's title under plea of not guilty.*

1. Warrant lines are made for the grantees of the state only, and do not bind purchasers from the warrantees; and the fact that a portion of woodland was, by an old warrant line, divided from the farm to which it was claimed to belong as such, is of no value upon the question whether it was seated or unseated.

2. In an action of trespass, in which title to woodland was claimed by the plaintiff as lessor of a purchaser, under a tax sale, as unseated, where the court charged that if the woodland was a part of the occupied tract and used as woodland belonging thereto, it was seated and could not be sold for taxes: but that it could be so sold if it had been severed from the cultivated portion of the tract with a view to its abandonment and assessment as unseated land, leaving such occupancy and use, or severance and abandonment, as questions of fact to the jury, the instruction was proper.

3. But where the only evidence of abandonment was the old warrant line and the act of the assessor in returning that portion as unseated, the evidence was insufficient as against the fact of its use as part of a larger and seated tract to raise the question: and the court need not have submitted it to the jury.

4. Where title was also claimed under a conveyance from a grantor, whose only right was as assignee for the benefit of creditors, he could not convey the land as his own, for he was but a trustee: and the land having been sold to the defendant in the action of trespass, by the sheriff upon a judgment entered before the assignment, he could not convey as trustee: and the conveyance passed no title.

5. In an action of trespass *de bonis asportatis* brought by plaintiff for timber cut by him upon the woodland, and which the defendant had seized and taken away as owner of the land and in possession of it as appurtenant to his seated land, *held*, that defendant could show his title under the plea of *not guilty*, to define his boundary, and possession, and ownership of the freehold: and though the timber had been severed, yet if done by a trespasser, the real owner might claim it as part of his freehold while yet on the land.

6. Consequently where the plaintiff counted in his *narr.* only for an asportation of his timber and not for a breach of his close, and the defendant pleaded *not guilty* and *liberum tenementum*, withdrawing the latter plea, but not his evidence, after exhibiting his title, the refusal of the court below to strike it out was not error.

Error to the Common Pleas of *Monroe county.*

This was an action of trespass, brought November 25th 1854, by Jacob Altemose against Jacob Hufsmith, to recover damages for timber cut by plaintiff on lands which he held as lessee or

[Altemose *v.* Hufsmith.]

licensee of John Merwine, who claimed to be the owner in fee simple.

Hufsmith was in actual possession of a tract of land in Monroe county, containing two hundred and ninety-one acres, which he had purchased at sheriff's sale in 1846, portions of which he had cultivated and improved. On a portion of the woodland, which defendant claimed as part of this farm, the plaintiff, Altemose, acting under the authority of Merwine, entered and cut some of the timber, which Hufsmith hauled to his house, and which was the trespass complained of.

The titles under which the parties claimed are clearly set forth in the charge of the court below (BARRETT, P. J.), portions of which were assigned for error.

To the usual plea of not guilty, the defendant added the following special plea, which, after the evidence was closed, was by leave of the court withdrawn :

"And for a further plea in this behalf, as to the seizing, taking, and removing the said goods and chattels in the said declaration mentioned, the said defendant, by leave of the court first had and obtained, according to the form of the statute in such case made and provided, says that the said plaintiff ought not to have or maintain his aforesaid action thereof against him, because he says that before and at the time of the said taking, he the said defendant was seised in his demesne as of fee, and lawfully possessed of a certain close in the township of Chestnut Hill, in said county, containing two hundred and ninety-one acres and one hundred and ten perches, and the said plaintiff had then and there wrongfully and injuriously entered in and upon the said close, and then and there cut and severed the said goods and chattels from the freehold of the said defendant within the said close, whereupon the said defendant took and removed the said chattels, doing no unnecessary harm to the said plaintiff, as it was lawful for him to do, for the cause aforesaid, which is the said supposed trespass in the introductory part of this plea mentioned, and whereof the said plaintiff hath above complained against this defendant. And this the said defendant is ready to verify. Wherefore he prays judgment, if the said plaintiff ought to have or maintain his aforesaid action thereof against him, &c."

After the defendant had withdrawn this plea the plaintiff's counsel requested the court to rule out the defendant's evidence of title to the land in which the timber was cut and taken, which was refused.

The court below charged the jury as follows :—

["The plaintiff claims the possession of the land upon which it was cut. He entered under John Merwine, and relies upon his title to justify the entry. The case must turn upon the question of title to the land, because, if Merwine had the title, his

[Altemose *v.* Hufsmith.]

license to the plaintiff was sufficient for him; if he had not, then the plaintiff was a mere trespasser without colour of title.] He was notified of the adverse claim. Hufsmith warned him not to go on the land. Had Merwine title to that piece of land? An assessment of taxes for the year 1838 and 1839 has been shown for one hundred and ninety-nine acres and one hundred and forty perches of the William Ross tract, followed by a sale for said taxes in June 1840 to John Merwine, and a deed in accordance with said sale. This conveyed to Merwine the title to that tract of land, if it was, during either of those years, the proper subject of a sale for taxes. This depends upon whether it was seated or unseated. Three tracts of land in Chestnut Hill township were surveyed by warrants from the Commonwealth in 1803, and duly patented to George Levers. The patentee, in 1814, conveyed to George Sieglin, John Sieglin, and Frederick Sieglin, as tenants in common, by deed, six hundred and ten acres and one hundred and thirty-nine perches, out of the William Ross, Mary Carr, and John Wilson tracts. The Sieglins entered into the immediate possession of the land so purchased. They made an improvement by clearing about fifty acres of land, building a house, &c., and occupied it by a resident settlement of the land. In 1815, the Sieglins sold off to Jesse Sieglin ninety-four acres of the land, who made an improvement, and has since resided upon it. George Sieglin, by some amicable partition, had a portion of the tract set off to himself, and had it improved in 1838 and 1839. Frederick Sieglin, Jr., purchased one hundred and ten acres of the tract, and had it improved in 1838 and 1839, making at least four distinct improvements on the six hundred and ten acres during those years. This left a balance of two hundred and ninety-one acres of the original purchase, including the house and improvements first made by John Sieglin, or John and Frederick. They had resided in the house, and occupied the farm and a saw-mill upon it from 1814, up to about the year 1839. There is some evidence that John Sieglin had sold out his interest in the land to Frederick Sieglin previous to that date. In 1839 Frederick had the exclusive possession. On the 4th day of July 1838, Frederick Sieglin made a voluntary assignment to Charles Haney for the benefit of his creditors, of the land, with all of his other property. On the 27th of November 1839, John Sieglin and his wife joined in a deed for their interest in the land to Charles Haney, as the assignee of Frederick Sieglin, for a nominal consideration, and doubtless in pursuance of the alleged previous contract between the parties. If it was only a consummation of a former agreement for its conveyance, then the effect of it was to vest the whole title in Frederick Sieglin. This left the two hundred and ninety-one acres in 1839 in the possession of and belonging to Frederick Sieglin.

[Altemose *v.* Hufsmith.]

Whether it was returned for the purposes of taxation, all as seated or part as seated and part unseated, from 1814 up to 1836, we are not informed. In 1836, 1837, 1838, and 1839, it is shown that Frederick Sieglin was assessed with one hundred and seventy-four acres of seated land. The question of the abandonment of a portion of a tract, after a portion of it is seated, or after it has been once treated as seated land, is a question of fact for the jury. Occupation of land without cultivation, and cultivation without occupation, gives it the character of seated land. The remaining two hundred and ninety-one acres embraced a part of the Mary Carr and a part of the William Ross. Perhaps from ninety to one hundred acres of the latter. The original line between the tracts was upon the ground, but there is no evidence of the line ever having been run from the time the warrants were laid. A portion of the 'William Ross' lies outside of the Sieglin purchase, but is not claimed in this suit, and therefore has nothing to do with it. That portion of the William Ross, inside of the lines of the six hundred and ten acres, is claimed under the treasurer's deed. Was it *seated* or *unseated*, from 1836 to 1839, inclusive? It was part of the two hundred and ninety-one acres; it was claimed by the occupant; it was used as woodland attached to a farm is usually occupied. It was included within the lines of the farm. [Is there any evidence to show that the Sieglins ever abandoned it to the unseated list; that they ever authorized it to be so assessed for taxes? The mere fact of Frederick Sieglin being assessed for only one hundred and seventy-four acres in the seated list is not sufficient; that may have been the mistake of the assessor. If shown to be the act of Sieglin it would be different.] Besides, there is no evidence as to what constituted the one hundred and seventy-four acres. It might as well have embraced the part of the 'Ross' survey as to be all of the 'Mary Carr.' If Sieglin had run off one hundred and seventy-four acres, marked his boundaries, and returned only the number of acres included within them for taxation in the seated list, it would have afforded strong evidence of the abandonment of the residue to the unseated list. [As it is, we are bound to instruct the jury that the whole two hundred and ninety-one acres were seated during the years for which they were assessed, and that the sale to Merwine conferred no title whatever.] If the tax sale was void, has any other title been shown in Merwine on which the plaintiff can rely? He claims the title of John Sieglin to an undivided half part of the whole two hundred and ninety-one acres, under a deed from the widow and heirs of John Sieglin, dated 13th February 1849. John Sieglin and wife had conveyed all of the interest they had to Charles H. Haney, assignee of Frederick Sieglin, on the 27th of November 1839. True, the deed was not recorded, but John

[Altemose *v.* Hufsmith.]

Merwine had it in his possession from 1846 to 1847, perhaps a whole year. He had been the clerk for the assignee of Sieglin. He obtained the deed from Walton upon his own application. He had at the time a treasurer's deed for a portion of the land. He was so far interested as to put him upon his inquiry in reference to the title. He had the motive for strengthening, if possible, the title he then had. Indeed, for aught we know, he had that very deed in his possession from 1846 until he delivered it to the other party on the trial of this cause. Had he notice of the conveyance previously made by John Sieglin and wife? Certainly he had notice, in fact, and in the very strongest form. He had the record in his pocket. He is therefore not an innocent purchaser without notice, and can take nothing by his deed.

["John Merwine had also a deed from Charles H. Haney, dated the 27th day of May 1848, for the premises. What title had Haney? · He does not convey as the assignee of Frederick Sieglin, but in his own right. He had no interest to convey as Charles Haney. If he had undertaken to convey in the character of assignee, then he had nothing to convey. The interest of Frederick Sieglin had been sold at sheriff's sale on a judgment, the lien of which attached in 1837, two years before the deed of assignment. Could he convey away the moiety of John Sieglin? Certainly not. It was conveyed to him as assignee. It was really conveyed to Frederick Sieglin. It vested the whole title in him. The sheriff's vendee took the whole interest of Frederick in the land sold. He took his right of possession as well as his title. The possession surrendered by John to Frederick passed to Hufsmith, the sheriff's vendee. John Sieglin had no right to re-enter as against Frederick, and his widow and heirs had no greater right. He could not, if living, take the possession against Hufsmith, and Charles Haney could not convey that right to Merwine. In any aspect of the case there was nothing to sell; there was not title in the grantors, and consequently Merwine acquired no title by his conveyances.

" This disposes of the plaintiff's paper titles, and very conclusively against him. He is left to rely upon his naked possession to sustain this action.]

" Jacob Hufsmith bought the property at sheriff's sale in 1846. He entered immediately into the possession of the house and farm, and has continued in possession of it ever since. That possession drew to it the possession of the woodland attached to it.

" If he used and occupied it as woodland attached to the farm, he was in the actual and not the constructive possession of it.

" If the ninety-eight acres of the William Ross survey was separate from the farm, clearly abandoned by Frederick Sieglin,

[Altemose *v.* Hufsmith.]

plainly set apart by lines and boundaries from his farm and other woodland, then it was unseated, and John Merwine has the title to it. The plaintiff was there under him, and was rightfully in the possession of the land. In that case he would be entitled to your verdict for the value of the timber. If he did not so set it apart, but used and occupied it as woodland attached to his farm, it was seated; the sale was void, and Merwine's license gave the plaintiff no authority to enter. If, however, the plaintiff in any manner in 1854 had the actual possession of the land upon which he cut the timber, he may recover its value. If he had the quiet, peaceable possession, it does not matter who was the owner; he could only be disturbed by due process of law. Against his actual possession the rightful owner had no authority to enter and carry away forcibly his personal property. The trees were severed from the freehold, and reduced to personal property. A doubtful or equivocal possession will not do. Possession as a trespasser is no possession. Only an actual possession under a claim of right will protect him.

"If the land was seated, and the possession in Hufsmith, you will find for the defendant.

"If it was unseated, you will find for the plaintiff. Or, if it was not, and you are satisfied that the plaintiff was in the actual possession of the land, your verdict should be for the plaintiff for the actual value of the timber at the place it was taken, and at that time."

Under these instructions there was a verdict and judgment for defendant. Whereupon the plaintiff sued out this writ, and assigned for error the refusal to allow him to ask one of defendant's witnesses, on cross-examination, "how many crops of rye were raised before (the case was arbitrated)." The admission in evidence of a portion of the testimony of James H. Walton, in which he said, "Haney once told me he had offered Hufsmith those papers (deeds and papers, which witness held as counsel for C. H. Haney, assignee of Frederick Sieglin, Sr.), for $25. If Hufsmith did not take them, he would let Merwine have them. I talked to Hufsmith on that subject."

3. In admitting in evidence the minutes of the Common Pleas of Monroe county, showing that John Merwine was the thirty-third juror on the list, and was called May 11th 1842, in a case then tried, whereby he acquired knowledge of the existence of the deed from John Sieglin to C. H. Haney.

4. In refusing to rule out defendant's evidence of title after he had withdrawn his special plea, and in charging as printed above in brackets.

*C. & M. Goepp,* for plaintiff in error.

*Reeder & Green,* for defendants.

[Altemose v. Hufsmith.]

The opinion of the court was delivered, May 6th 1863, by

THOMPSON, J.—The plaintiff in this case claims to have entered and cut the timber for which this action was brought, under a parol lease or license from John Merwine, on the terms of having the first two crops of grain which should be raised on the ground cleared. Merwine had no actual possession of any part of the land to which this license was intended to apply, and never had, but claimed title to it in two ways, both of which we think were properly treated by the court, and resulted in demonstrating that neither were worth anything.

The tax title was relied on to hold ninety-eight acres of land, part of a tract of seated land, which had been occupied, improved, and cultivated for more than twenty years. The theory for this was, that as the occupant of it had been assessed with only one hundred and seventy-four acres instead of two hundred and ninety-one, the balance was abandoned, and was properly placed on the unseated list and sold for taxes. It is supposed that this theory was strengthened by the fact that an old warrant line severed this portion of the tract from the farm to which it belonged. This is not so. Warrant lines were made for the grantees of the state, but they bind not purchasers from the warrantees. A farm may be and often is composed of parts of several adjacent tracts, and it is no more necessary that its occupant should actually cultivate each fraction than that he should cultivate the whole, where it had always been a unit, to render it seated. The only question to be determined is, whether it is part of the occupied tract, and used as woodland belonging to it. If so, it is seated and cannot be sold. This was in substance what the court told the jury, and left for their decision. So too did the court leave it as a question for the jury whether in fact the portion of ninety-eight acres sold for taxes had been severed and set apart from the cultivated portion of the tract, with a view to be abandoned and assessed as unseated. On both these questions the jury found against the plaintiff, and thus demolished that branch of title relied on by him. The plaintiff had an advantage in this treatment of the evidence, which I doubt if he was entitled to; for I see no sufficient evidence to have required the question to be submitted to the jury. The mistakes of assessors never alter the rights of parties. Something more must be shown. The assent of the owner of land that is to be assessed and treated as unseated, may make a different case when a sale of it as such ensues. In such a case he may be estopped from denying a character given to it by himself. That is not this case. The only evidence on which to raise the question, was the old warrant line submerged in the farm, and the act of the assessor in returning it unseated. The court might well have said that neither of these nor both together, in view of

[Altemose *v.* Hufsmith.]

the well-known usages of the country, were sufficient evidence of abandonment against the fact of its use as part of a larger tract which was seated.

The other branch of title has less of merit in it if possible. Haney had no right to convey the land as his own, for he was but a trustee; and he could not convey as trustee, for the land had been sold on a judgment against his assignor. This title needs no further notice. It was manifestly worthless, and the court erred in nothing they said about it.

From this view of it, we need not notice, at any length, the error assigned on the testimony admitted to prove Haney's declarations while he held the title. If it was not properly evidence, it was of no consequence. But we do not say it was improper. We leave it where the rule of law leaves declarations of parties against their interest, and where a successor in title is the party: 2 Barr 372; 3 Rawle 477.

This disposition of the title under which the plaintiff claims to have entered, left such entry a mere trespass in fact on the possession of the defendant. But it seems to be objected that, owing to the pleadings, this could not appear. The plaintiff says he did not count for a breach of his chose, but only for an asportation of his timber. That is true. To this the defendant pleaded not guilty, and *liberum tenementum*, but withdrew the latter plea after exhibiting his title, but did not withdraw his evidence, and the court refused to rule it out. I confess myself at a loss to know why a defendant in possession may not also show his title, as evidence under the plea of "not guilty," to define his boundary and possession, and thus show that the severed portion of the freehold was his own and not another's; and therefore that he is not guilty of trespass in taking what was his own. It will be found to be settled on authority not to be shaken, that timber blown down does not belong to the tenant but to the lessor: 4 Rep. 62 a. So it has been held that timber cut by a lessee may be taken by the lessor: 11 Id. 81 e. In Rogers *v.* Gillinger, 6 Casey 185, this court held that the fragments of a building torn to pieces by a tempest, although severed and scattered, still belonged to and were part of the freehold. Upon the same reason, when timber is cut by a trespasser, why shall not the owner claim it as part of his freehold? It stands upon the same reason, and must be judged of by the same rule. The owner did not assent to its severance, and while it remains on the premises he may claim it as part of his freehold: Harlan *v.* Harlan, 3 Harris 507. In such an aspect, therefore, it was proper to show title. It would not merely justify a taking, but it authorized it. I cannot, therefore, see any error in refusing to rule out the defendant's title.

It is true notwithstanding this, and notwithstanding title in

[Altemose *v.* Hufsmith.]

the defendant, if the plaintiff had shown an actual occupancy claiming title, peaceably and fairly obtained, of the land on which the timber grew, this would have given him title by disseisin, and turned the true owner to his action to dispossess him : 1 Watts 69 ; 1 Barr 295 ; 2 Preston's Abstracts of Title, *et seq.* 279.

In substance this was the law given to the jury by the learned judge in his charge, and the question of fact, whether the plaintiff had actual and peaceable possession of the land where the timber was cut, was referred to the jury with instructions that if he had, he was entitled to recover the value of the timber taken. These instructions were as favourable as the plaintiff was entitled to. They placed his case on the only ground that remained. The jury found this point also against him, and manifestly rightly so found it, if we regard the testimony in the cas '.

These are all the points we think necessary to notice in this case ; all the others were either properly answered or are immaterial.

Judgment affirmed.